IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

| | | |
|---|---|---|
| LAURA BEWLEY, | § | |
|     PLAINTIFF, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. 4:08-CV-750-Y |
| | § | |
| MICHAEL J. ASTRUE, | § | |
| COMMISSIONER OF SOCIAL SECURITY, | § | |
|     DEFENDANT. | § | |

FINDINGS, CONCLUSIONS AND RECOMMENDATION
OF THE UNITED STATES MAGISTRATE JUDGE
AND
NOTICE AND ORDER

This case was referred to the United States Magistrate Judge pursuant to the provisions of Title 28, United States Code, Section 636(b).  The Findings, Conclusions and Recommendation of the United States Magistrate Judge are as follows:

FINDINGS AND CONCLUSIONS

A.      STATEMENT OF THE CASE

Plaintiff Laura Bewley filed this action pursuant to Sections 405(g) and 1383(c)(3) of Title 42 of the United States Code for judicial review of a final decision of the Commissioner of Social Security denying her claims for disability insurance benefits under Title II and supplemental security income ("SSI") benefits under Title XVI of the Social Security Act ("SSA").  On February 25, 2004, Bewley applied for disability insurance and SSI benefits, with a protective filing date of February 9, 2004 for the SSI benefits claim.  (Transcript ("Tr.") 27, 201-

1

04, 880-82.)[1]  She alleged that she became disabled on December 12, 2002. (Tr. 27, 201, 223.)

Her applications were denied initially, on reconsideration, and in an ALJ decision dated April 25, 2006.  (Tr. 27; *see* Tr. 46-58, 65-78, 80-82, 884-90, 892-915.)  Bewley filed a written request for review, and the Appeals Council, on November 8, 2006, vacated the ALJ decision and remanded the case for further proceedings.  (Tr. 27, 62-64, 96-139.)  The ALJ held a second hearing on January 16, 2008 and issued a decision on February 26, 2008 that Bewley was not disabled because she was capable of performing work that existed in significant numbers in the national economy.  (Tr. 24-40; *see* Tr. 182-86, 194-95.)  The Appeals Council denied Bewley's request for review, leaving the ALJ's decision to stand as the final decision of the Commissioner. (Tr. 9-11; *see* Tr. 6, 22.)

B.     STANDARD OF REVIEW

Disability insurance is governed by Title II, 42 U.S.C. § 404 *et seq.*, and SSI benefits are governed by Title XVI, 42 U.S.C. § 1381 *et seq.*, of the SSA.  In addition, numerous regulatory provisions govern disability insurance and SSI benefits.   *See* 20 C.F.R. Pt. 404 (disability insurance); 20 C.F.R. Pt. 416 (SSI).  Although technically governed by different statutes and regulations, "[t]he law and regulations governing the determination of disability are the same for both disability insurance benefits and SSI."  *Greenspan v. Shalala*, 38 F.3d 232, 236 (5th Cir. 1994).

The SSA defines a disability as a medically determinable physical or mental impairment lasting at least twelve months that prevents the claimant from engaging in substantial

---

[1] Bewley previously filed applications for disability insurance benefits and SSI payments, which were denied on April 29, 2003.  (Tr. 27.)

gainful activity.  42 U.S.C. §§ 423(d), 1382c(a)(3)(A); *McQueen v. Apfel*, 168 F.3d 152, 154 (5th Cir. 1999).  To determine whether a claimant is disabled, and thus entitled to disability benefits, a five-step analysis is employed.  20 C.F.R. § 416.920 (2009).  First, the claimant must not be presently working at any substantial gainful activity.  Substantial gainful activity is defined as work activity involving the use of significant physical or mental abilities for pay or profit.  20 C.F.R. § 416.972.   Second, the claimant must have an impairment or combination of impairments that is severe.  20 C.F.R. § 416.920(c); *Stone v. Heckler*, 752 F.2d 1099, 1101 (5th Cir. 1985), *cited in Loza v. Apfel*, 219 F.3d 378, 392 (5th Cir. 2000).  Third, disability will be found if the impairment or combination of impairments meets or equals an impairment listed in the appendix to the regulations.  20 C.F.R. § 416.920(d); *see* 20 C.F.R. Pt. 404, Subpt. P, App. 1 ("Listing").  Fourth, if disability cannot be found on the basis of the claimant's medical status alone, the impairment or impairments must prevent the claimant from returning to his past relevant work.  *Id.* § 416.920(e).  And fifth, the impairment must prevent the claimant from doing any work, considering the claimant's residual functional capacity, age, education, and past work experience.  *Id.* § 416.920(f); *Crowley v. Apfel,* 197 F.3d 194, 197-98 (5th Cir.1999).  At steps one through four, the burden of proof rests upon the claimant to show he is disabled.  *Crowley*, 197 F.3d at 198.  If the claimant satisfies this responsibility, the burden shifts to the Commissioner to show that there is other gainful employment the claimant is capable of performing in spite of his existing impairments.  *Id.*

A denial of disability benefits is reviewed only to determine whether the Commissioner applied the correct legal standards and whether the decision is supported by substantial evidence in the record as a whole.  *Leggett v. Chater*, 67 F.3d 558, 564 (5th Cir. 1995); *Hollis v. Bowen*,

3

837 F.2d 1378, 1382 (5th Cir. 1988). Substantial evidence is such relevant evidence as a responsible mind might accept to support a conclusion. *Boyd v. Apfel*, 239 F.3d 698, 704 (5th Cir. 2001). It is more than a mere scintilla, but less than a preponderance. *Id*. A finding of no substantial evidence is appropriate only if no credible evidentiary choices or medical findings support the decision. *Id.* This Court may neither reweigh the evidence in the record nor substitute its judgment for the Commissioner's, but will carefully scrutinize the record to determine if the evidence is present. *Harris v. Apfel*, 209 F.3d 413, 417 (5th Cir. 2000); *Hollis*, 837 F.2d at 1383.

C.     ISSUES

1.   Whether substantial evidence supports the ALJ's finding that none of Bewley's severe impairments met or equaled section 12.04C of the Listing.

2.   Whether the ALJ erred by failing to make a finding that Bewley could maintain employment over a sustained period of time.

D.     ADMINISTRATIVE RECORD

1.   Relevant Treatment History

From July 2000 through January 2006,[2] Bewley was treated at the Mental Health Mental Retardation of Tarrant County ("MHMR"). (Tr. 300-493, 573-667.) In the summer of 2000, Bewley complained that she was having problems sleeping and was irritable, angry, and agitated. (R. at 471; *see* Tr. 470-92.) She reported that she had a prior substance abuse problem, had not been abusing drugs or alcohol for six months, and was currently taking Methadone. (Tr. 492.) She was diagnosed with Bipolar I Disorder, severe and recurrent, and prescribed Lithium. (Tr. at

---

[2] Bewley failed to show up to multiple appointments at MHMR from 2000 through 2007 and sometimes ran out of her medications. (*See, e.g.*, Tr. 405, 413-15, 422, 431-32, 435, 441-43, 464, 466, 452, 607, 626, 660, 662, 841-42, 849-50, 861-63, 878.)

474, 479, 483-84.)

In September 2000, she reported that she was feeling better, and she was prescribed Trazodone in addition to the Lithium.  (Tr. 463, 468; *see* Tr. 467-469.)  In November and December 2000, Bewley stated that she was feeling anxious and depressed and experiencing elevated mania.  (Tr. 457-62.)  From January 2001 through February 2001, Bewley reported that she was sleeping and feeling better and that she had recently had a seizure. (Tr. 449-50, 453-45.) Bewley's Lithium dosage was decreased and her medical records indicated that she had Hepatitis C.  (*Id.*; *see also* Tr. 446-47.)  In March, she was taken off Lithium and prescribed Neurontin and Trazodone.  (Tr. 445-46.)

From May 2001 through December 2001, Bewley reported that she felt a range of symptoms, including that she was sleeping better, feeling hyper, angry and depressed, and experiencing mood swings and racing thoughts.  Her GAF[3] was rated at 50.[4]  (Tr. 409, 411, 416, 421, 426, 428, 430, 436, 438-40.)  Bewley's medications were adjusted, and she was started on Zyprexa.  (Tr. 407, 410, 412, 417, 419-20, 423, 425, 427, 429, 434, 437.)  By the end of 2001, Bewley had lost her job and was experiencing increased agitation and insomnia.  (Tr. 406.)

From February 2002 through January 2003, Bewley reported that she was, for the most part, doing great, sleeping well, and had obtained a job in phone sales.  She continued to be prescribed Methadone, Zyprexa, and Neurontin.  (Tr. 366-400.)  From February 2003 through

---

[3] A GAF score is a standard measurement of an individual's overall functioning level with respect to psychological, social, and occupational functioning.  AMERICAN PSYCHIATRIC ASSOCIATION, DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS 32 (4th ed. 1994) (DSM-IV).

[4] A GAF score of 41 to 50 reflects serious symptoms or any serious impairment in social, occupational, or school functioning.  DSM-IV at 34.

May 2003, Bewley indicated that she was experiencing an increase in mania, insomnia, agitation, irritability, depression, and mood lability.  (Tr. 346-65.)  She continued to be prescribed a variety of medications, including Seroquel, Zyprexa, Neurontin and Topamax.  (*Id.*)

From June 2003 through August 2003, Bewley reported that she was feeling and sleeping better and that her appetite had increased.  (Tr. 335-45.)  In October 2003, Bewley stated that she had been fired because of an argument with a co-worker but that she continued to feel good.  (Tr. 332.)  In November and December 2003, Bewley reported that she was feeling more depressed and anxious and having crying spells.  (Tr. 325-329.)  Her medications continued to be adjusted during this time period.  (*Id.*)

From January 2004 through August 2004, Bewley reported that she was feeling good on her current medications most of the time, with an occasional increase in irritability, anxiety, and mood swings.  (Tr. 300-323.)  Her doctors continued to prescribe her various medications and to adjust the dosage levels as necessary.  (*Id.*)  Her GAF was rated at 46 during this time period. (Tr. at 300-01, 303-04.)

A Disability Determination and Transmittal ("DDT") Form, Form SSA-831-U3, dated June 14, 2004 and signed by S. Spoor, M.D., indicated that Bewley was diagnosed with mild arthritis of both knees and bipolar and was not disabled.[5]  (Tr. 44, 883.)  A DDT Form dated September 30, 2004 and signed by S.W. Casner, M.D., affirmed the June 14, 2004 diagnosis and opinion.[6]  (Tr. 45, 891.)

---

[5] This form also indicates that it was reviewed by Stephanie Banner, a disability examiner, on June 8, 2004. (Tr. 44.)

[6] This DDT form states that it affirms the original determination of July 14, 2004.  The court assumes that the July 14, 2004 date is a typographical error and the correct date is June 14, 2004.

In a Daily Activity Questionnaire ("DAQ") dated September 8, 2004, Bewley stated that her mental and emotional problems limited her ability to get along with others, pay her bills, and attend her doctor appointments. (Tr. 257; *see* Tr. 257-60.) She further indicated that she could sometimes clean and do her laundry but that she had difficulty caring for herself and was unable to prepare her meals and handle her bills. (Tr. 258.) She also stated that when she became upset she would lock herself in her room for long periods of time. (Tr. 259.)

In several undated DAQs, Bewley stated that she suffered from, among other things, bipolar disorder, manic depression, seizures, arthritis, panic attacks, and racing thoughts, which limited her ability to work. (Tr. 216-22, 244-49.) She further indicated that she prepared her own meals, performed household chores, had problems remembering things, and was taking a variety of medications to help with her impairments. (Tr. 220, 236-37, 244-49.) She also report that, since she was on the right combination of medications, she enjoyed going to her son's sporting events. (Tr. 246.)

In a Psychiatric Review Technique Form ("PRTF") dated April 12, 2004, Stephanie Judice, M.D., opined that Bewley suffered from a bipolar disorder that did not satisfy the diagnostic criteria or the "C" criteria under Section 12.04 of the Listing and from a substance addiction disorder that also did not satisfy the diagnostic criteria under Section 12.09 of the Listing. (Tr. 270-83.) Judice further stated the Bewley was mildly restricted in her activities of daily living and had moderate difficulties in maintaining concentration, persistence, or pace. (Tr. 280.)

In a Mental Residual Functional Capacity Assessment ("MRFC"), also dated April 12, 2004, Judice opined that Bewley was moderately limited in her ability to understand, remember,

and carry out detailed instructions; maintain attention and concentration for extended periods; perform activities within a schedule, maintain regular attendance and be punctual within customary tolerances; complete a normal workday and workweek without interruptions from psychologically based symptoms and perform at a consistent pace without an unreasonable number and length of rest periods; and respond appropriately to changes in the work setting.  (Tr. 284-86.)

In a Physical Residual Functional Capacity Assessment ("PRFC") performed by S. Spoor, M.D., on June 14, 2004 and affirmed by S.W. Casner, M.D., on September 30, 2004, Spoor opined that Webb could occasionally lift and/or carry 20 pounds, frequently lift and/or carry ten pounds, sit, stand and/or walk for a total of about six hours in an eight-hour workday, and had the unlimited ability to push and/or pull.  (Tr. 511-18.)  Spoor, diagnosing Bewley with mild arthritis in both knees, chronic rotator cuff tendonitis of the left shoulder, and seizures, noted that Bewley also suffered from hepatitis, in which there was no evidence of end-organ damage, and had a history of grand mal seizures that were controlled by medications.  (Tr. 511-14.)

At the request of the disability examiner, Bewley was examined by James Gross, M.D., on May 3, 2004 as to her arthritis, seizures, and chronic hepatitis B and C.  (Tr. 288-97.)  Gross stated that Bewley had evidence of mild arthritis in both knees, chronic rotator cuff tendonitis of the left shoulder, had experienced no seizures in the last two years, and had chronic hepatitis B and C by self diagnosis only as the physical examination revealed no evidence of chronic liver disease.  (Tr. 290.)

In a PRTF dated September 16, 2004, Norvin Curtis, Ph.D., opined, among other things,

8

that Bewley suffered from a bipolar disorder, which did not precisely satisfy the diagnostic criteria or the "C" criteria of Section 12.04 of the Listing.  (Tr. 493-506.)  He further stated that Bewley was mildly restricted in her activities of daily living, had mild difficulties in maintaining social functioning, and moderate difficulties in maintaining concentration, persistence, or pace. (Tr. 503.)

In a MRFC, also dated September 16, 2004, Curtis opined that Bewley was markedly limited in her ability to understand, remember, and carry out detailed instructions and moderately limited in her ability to maintain attention and concentration for extended periods; make simple work-related decisions, complete a normal workday and workweek without interruptions from psychologically based symptoms and perform at a consistent pace without an unreasonable number and length of rest periods; accept instructions and respond appropriately to criticism from supervisors; respond appropriately to changes in the work setting; and set realistic goals or make plans independently of others.  (Tr. 507-08.)

From August 2004 through December 2005, Bewley was treated at the John Peter Smith Health Network for various ailments, including issues relating to her torn left rotator cuff and a hiatal hernia.  (Tr. 520-35, 541-49.)  From 2004 through 2005, Bewley also received treatment at the Hemphill Treatment Facility.  (Tr. at 550-71.)

In October 2004, treatment notes from MHMR indicate that Bewley was experiencing an increase in depressive symptoms and mood lability, and she was given a GAF score of 45.  (R. 642.)   Bewley, however, reported that she was doing well and that her medications were working.  (Tr. 641.)  By the end of October, her GAF was rated at 48.  (Tr. at 632, 35.)

In January 2005, Bewley appeared to be doing well and was working on relationships

with her family.  (Tr. 619-21, 624.)  Toward the end of January through February, she was experiencing mild hostility and anxiety and began feeling more depressed due to conflicts with her family after the recent death of her mother.  (Tr. 614-18.)  Her GAF continued to be rated at 48  (Tr. 618), and some of her medication dosages were increased.  (Tr. 610, 614-15, 617.)  In late February, her GAF was rated at 45 and in March it was increased to 48.  (Tr. 605, 612.)  From April through July, Bewley reported that she was feeling better and she continued to take her medications.  (Tr. 582-594, 600-01.)

In May 2005, Bewley had gallstones removed.  (Tr. 669-90.)  Bewley complained in late July that she had been feeling more irritable and had a short temper.  (Tr. 578-79.)  In August 2005, her GAF was rated at 44, and she continued to experience depression and mood lability.  (R. at 573-75.)  From September through November, Bewley continued to feel depressed and her medications were adjusted.  (Tr. 652-57, 666-68.)

From January through May 2006, Bewley reported that her medications were working fine, but that she was having some mood swings, irritability, and racing thoughts.  (Tr. 646, 751-52, 756-57, 764-65.)  Her GAF was rated at 45.  (*Id*.)  In March 2006, Bewley had an MRI taken on her left shoulder, which revealed a high-riding humeral head, marked acromioclavicular[7] joint arthropathic[8] changes, and joint effusion.  (Tr. 780-86.)

In a letter dated May 25, 2006 and addressed to "To Whom It May Concern," Geetha

---

[7] Acromioclavicular is pertaining to the lateral extension of the spine of the scapula, projecting over the shoulder joint and forming the highest point of the shoulder, and clavicle.   DORLAND'S ILLUSTRATED MEDICAL DICTIONARY 21 (31st ed. 2007.)

[8] Arthropathic is pertaining to or characterized by joint disease.  DORLAND'S ILLUSTRATED MEDICAL DICTIONARY 160-61 (31st ed. 2007.)

Reddy, M.D., a doctor at MHMR, opined, "Due to her mental illness Laura [Bewley] is unable to pursue gainful employment. Laura is unable to handle stress. If placed under stress Laura would begin to decompensate." (Tr. 707.)  In July and August, Bewley complained that she did not have an appetite, felt manic all the time, and was depressed, nervous, worried, and stressed. Her GAF continued to be rated at 45, and her medications continued to be adjusted. (Tr. 733-34, 736-37.)  In September 2006, Bewley reported that she had stopped taking Lithium because she was hearing music and was experiencing increased mood swings and racing thoughts. (Tr. 726-27.)  In December, Bewley stated that she felt like her mediations were working and her GAF was upgraded to a 50. (Tr. 713-15.)

In December, Bewley was also admitted to the emergency room because she had become unresponsive due to anxiolytic[9] intoxication.   (Tr. 802; *see* Tr. 801-839.)   During the hospitalization, she underwent a psychiatric evaluation with Edward Furber, M.D., in which she reported that she tended to worry excessively but that she had not had a depressed or manic episode for a number of years secondary to the medications she was taking. (Tr. 809.)  Furber diagnosed her with several impairments, including Bipolar I Disorder, most recent episode unspecified, and generalized anxiety disorder, and he rated her GAF at 55. (Tr. 812.)

In February 2007, Bewley complained that she had been feeling depressed and anxious and had decreased energy. (Tr. 868-69.)  Her GAF was rated at 45. (*Id.*)  In March, she stated that she felt less depressed and more stressed, heard constant ringing in her ears, and low energy levels. (Tr. 867.)  Bewley complained in June that she was feeling depressed over the recent

---

[9] Anxiolytic refers to antianxiety or an antianxiety agent. DORLAND'S ILLUSTRATED MEDICAL DICTIONARY 113 (31st ed. 2007.)

11

death of her father.  (Tr. 851-52.)  Her GAF continued to be rated at 45.  (Tr. 852.)

2.  Administrative Hearing

Bewley was born on August 23, 1962, dropped out of high school in the ninth grade, and later obtained her GED.  (Tr. 221, 880, 901-02; *see* Tr. 487.)  She previously worked as a telemarketer, telemarketer monitor, and a truck driver.  (Tr. 206-15, 217, 227, 903, 912.)

At the February 15, 2006 hearing, Bewley testified that she last worked in 2003.  (Tr. 902-03.)  She stated that when she was manic her mind raced very fast and she could not keep focused on a job.  (Tr. 904-05.)  She further stated that she got depressed once or twice a month and would go to her room and shut the door.  (Tr. 905.)  She further complained that she heard ringing in her ears and often became angry and irritable.  (Tr. 905-06.)  She testified that she had arthritis in her left arm and knees and that she could not use her left arm to pick anything up.  (Tr. 906-09.)  She further stated that she had hepatitis C that was not currently bothering her and that she had not had a seizure in a long time because of her medication.  (Tr. 907-08.)

At the January 16, 2008 hearing, Bewley testified that her depression has become worse since the last hearing, none of the medications seemed to be working, and she continued to have ringing in her ears.  (Tr. 920, 927.)  She stated that the arthritis in her leg was worse, she could not or stand for very long, and she had numbness in her leg when she sat down.  (Tr. 921.)  She also testified that she could not do much with her left arm and that her knees, elbows, and feet hurt.  (Tr. 928-30.)  She stated that she no longer attended many of her children's activities and that her boyfriend does all the shopping and the laundry.  (Tr. 925.)

Dillon Snowden, a vocational expert ("VE"), also testified at the hearing.  He testified that, based on the ALJ's hypothetical, Bewley would not be able to perform her past relevant

work but she would be able to perform unskilled work as a bench assembler, inspector, or surveillance system monitor.  (Tr. 930-32.)

    3.   ALJ Decision

The ALJ, in his February 26, 2008 decision, found that Bewley had not engaged in any substantial gainful activity at any time relevant to his decision.  (Tr. 28.)  He further found that she had the severe impairments of hypothyroidism, mild arthritis in her knees, a history of hepatitis B and C, a seizure disorder, degenerative changes and a torn rotator cuff in her left shoulder, generalized anxiety disorder, bipolar disorder, and severe depression currently with psychotic features.  (*Id*.)  He found that none of her impairments, however, met or equaled the severity of any impairment in the Listing.  (*Id*.)  As to this issue, the ALJ stated:

> In determining if the claimant's impairments, either singly or in combination, meet or equal the severity of any listed impairment at 20 C.F.R. Part 404, Subpart P, Appendix 1, I must consider the opinions of the State agency medical consultants who evaluated this issue at the initial and reconsideration levels of the administrative review process, pursuant to 20 C.F.R. §§ 404.1527 and 416.927 and Social Security Ruling 96-6p.  I concur with the State agency medical consultants that the severity of the claimant's impairments does not meet or equal any listed impairment at Appendix 1 and that she is limited both mentally and physically, but she is not disabled.  However, I do not construe any of the assessed limitations as to mental capacity in the prior determinations as establishing the claimant is incapable of working on a consistent, sustained basis.
>
>    . . . .
>
> In February 2006, the claimant's treating MHMR psychiatrist, Geetha Reddy, M.D., noted the claimant had had a mostly full medication response.  The claimant reported medications were helping.  She reported some irritability and mood swings but no racing thoughts.  Although she was anxious and hyperactive, those symptoms were due to an upcoming appointment for her shoulder.
>
>    . . . .
>
> In May 2006, Dr. Reddy stated the following in a letter.  She had treated

13

the claimant since 2002, and the claimant was diagnosed with bipolar I disorder, mixed, severe, without psychotic features. Due to her mental illness, the claimant was unable to pursue gainful employment and unable to handle stress. With stress the claimant would begin to decompensate.

    . . . .

    I also note Dr. Reddy stated in May 2006 that the claimant could not pursue gainful employment or handle stress due to her mental illness. However, treatment records from MHMR discussed above and the remaining credible medical evidence does not support that statement. The claimant is able to care for two children in the home. When hospitalized in December 2006, the claimant had a very good mental status examination. She reported at that time that she had not experienced depressive or manic episodes with medications for a number of years. Her GAF was 55, as assessed by a psychiatrist who was not affiliated with MHMR. The claimant's GAF has rarely been modified by MHMR to correspond with the waxing and waning of the claimant's symptoms. Given the lack of evidence to support Dr. Reddy's opinion, I find there is good reason to reject it. Therefore, I have afforded it little weight. *See Newton v. Apfel*, 209 F.3d 448 (5th Cir. 2000); *Myers v. Apfel*, 238 F.3d 617 (5th Cir. 2001), 20 C.F.R. §§ 404.1527(d) and 416.927(d), and Social Security Ruling 96-5p.

(Tr. 28-29, 31, 36 (internal references omitted).)

    The ALJ further stated:

In this case, I have concluded the claimant's medical impairments have mildly restricted her activities of daily living (as she is capable of a wide range of such activities), have created moderate difficulties in maintaining social functioning (giving the claimant the benefit of every doubt as to her allegations regarding significant irritability and lashing out at others, despite maintaining a relationship with the same man for seven years and with her children, and she was close to her mother), have resulted in moderate deficiencies of concentration, persistence, or pace (giving the claimant the benefit of the doubt as to her symptoms and racing thoughts), and have never resulted in episodes of decompensation. There is no evidence she meets the "C" criteria of any applicable listing. *See* 20 C.F.R. §§ 202.1520a and 416.920a.

    . . . The claimant retains the ability to obtain, perform, and maintain the following residual functional capacity: She can lift and carry twenty pounds occasionally and ten pounds frequently, and she can stand and walk six hours and sit six hours in an eight-hour workday, provided she be allowed to periodically alternate sitting and standing to relieve pain or discomfort. . . . She can

14

understand, remember, and carry out short, simple instructions and make judgments on simple work-related decisions.  She must have only incidental contact with the public and only occasional contact with coworkers.  *See* 20 C.F.R. §§ 404.1545 and 416.945, *Watson v. Barnhart*, 288 F.3d 212 (5th Cir. 2002), and *Singletary v. Bowen*, 798 F.2d 818 (5th Cir. 1986).

(Tr. 37.)  The ALJ further opined, based on his RFC assessment, that Bewley was unable to perform her past relevant work as a telemarketer but there was work that existed in significant numbers in the national economy that she could perform; consequently, she was not disabled.  (Tr. 37-39.)

E.    DISCUSSION

1.  Listed Impairments

The first issue is whether substantial evidence supports the ALJ's finding that none of Bewley's severe impairments met or equaled section 12.04C of the Listing.  Section 12.04C, which addresses affective or mood disorders, states:

12.04 Affective Disorders: Characterized by a disturbance of mood, accompanied by a full or partial manic or depressive syndrome. . . .

C.    Medically documented history of a chronic affective disorder of at least 2 years' duration that has caused more than a minimal limitation of ability to do basic work activities, with symptoms or signs currently attenuated by medication or psychosocial support, and one of the following:

1. Repeated episodes of decompensation, each of extended duration; or
2. A residual disease process that has resulted in such marginal adjustment that even a minimal increase in mental demands or change in the environment would be predicted to cause the individual to decompensate; or
3. Current history of 1 or more years' inability to function outside a highly supportive living arrangement.

20 C.F.R. Part 404, Subpt. P, App. 1, § 12.04C.

Bewley claims that there is evidence in the record that she met the first part of section 12.04C because: (1) she has demonstrated a medically documented history of a chronic affective disorder for over two years as her earliest treatment notes documenting a Bipolar Disorder start in July 2000 and (2) there is evidence in the record that Bewley's Bipolar Disorder has caused more than a minimal limitation on her ability to do basic work activities and the symptoms and signs are currently attenuated by medication or psychosocial support.  (Pl.'s Br. at 11.)  Bewley claims that the opinion of her treating physician, Reddy, that stress would cause Bewley to decompensate meets the provision in Subsection 2 of Section 12.04C, requiring a residual disease process that has resulted in such marginal adjustment that even a minimal increase in mental demands or change in the environment would be predicated to cause the individual to decompensate.  (*Id.*)  Bewley argues that the ALJ erred by not giving Reddy's opinion as a treating source any weight at Step Three of the disability analysis as required by 20 C.F.R. § 404.1527(d)(2) when there is no other evidence in the record that controverts his opinion.  (Pl.'s Br. at 12.)

The claimant has the burden of proving that her impairment or combination of impairments meets or equals a listing at Step Three.  *Selders v. Sullivan*, 914 F.2d 614, 619 (5th Cir. 1990).  "For a claimant to show that his impairment matches [or meets] a listing, it must meet *all* of the specified medical criteria."  *Sullivan v. Zebley*, 493 U.S. 521, 530 (1990).  An impairment, no matter how severe, does not qualify if that impairment exhibits only some of the specified criteria.  *Id.*  If a claimant does not exhibit all of the requisite findings of a listed impairment, medical equivalence may be established by showing that his unlisted impairment, or

16

combination of impairments, is equivalent to a listed impairment. *Id.* at 531. To do so, the claimant must present medical findings equal in severity to all the criteria for the one most similar listed impairment. *Zebley*, 493 U.S. at 531 (*citing* 20 C.F.R. § 416.926(a)). A claimant's disability is equivalent to a listed impairment if the medical findings are at least equal in duration and severity to the listing findings. *See id*. The court will find that substantial evidence supports the ALJ's finding at Step Three if the plaintiff fails to demonstrate the specified medical criteria. *Selders*, 914 F.2d at 619-20.

As a threshold matter, the ALJ is responsible for ultimately deciding the legal question whether a listing is met or equaled. SSR 96-6p, 1996 WL 374180, at *3 (S.S.A. July 2, 1996); *see generally* SSR 96-5p, 1996 WL 374183, at *3 (S.S.A. July 2, 1996); 20 C.F.R. §§ 416.926(e), 416.927(e). Whether a claimant's impairment meets the requirements of a listed impairment is usually more a question of medical fact than opinion because most of the requirements are objective and simply a matter of documentation, but it is still an issue ultimately reserved to the Commissioner. SSR 96-5p, 1996 WL 374183, at *3. Whether the impairment is equivalent in severity to the requirements of a listed impairment requires a judgment that the medical findings equal a level of severity that prevents a person from doing any gainful activity. *Id.* at *4. When determining whether an impairment medically equals a listing, the Commissioner considers all relevant evidence[10] in the record about such impairment, including findings from medical sources. 20 C.F.R. §§ 404.1526(c), 416.926(c) (stating that opinions that medical consultants designated by the Commissioner offer on the issue of medical

---

[10] Relevant evidence does not include the claimant's vocational factors of age, education, and work experience. 20 C.F.R. § 416.926(c).

equivalence will be considered).  Medical equivalence must be based on medical findings that are supported by medically acceptable clinical and laboratory diagnostic techniques.  *See generally* 20 C.F.R. §§ 404.1526, 404.1527, 416.926, 416.927.

Controlling weight is assigned to the opinions of a treating physician if well-supported by medically acceptable clinical and laboratory diagnostic techniques and not inconsistent with other substantial evidence in the record.  20 C.F.R. § 404.1527(d)(2), 416.927(d)(2); *Martinez v. Chater*, 64 F.3d 172, 176 (5th Cir. 1995); *Bowman v. Heckler*, 706 F.2d 564, 568 (5th Cir. 1983). However, the determination of disability always remains the province of the ALJ, and the ALJ can decrease the weight assigned to a treating physician's opinion for good cause, which includes disregarding statements that are brief and conclusory, unsupported by acceptable diagnostic techniques, or otherwise supported by the evidence.  *Leggett*, 67 F.3d at 566; *Greenspan v. Shalala*, 38 F.3d 232, 237 (5th Cir. 1994).  *See also* 20 C.F.R. §§ 404.1527(e), 416.927(e).  Conclusory statements to the effect that the claimant is disabled or unable to work are legal conclusions, not medical opinions, and are not entitled to any special significance.  *See* 20 C.F.R. §§ 404.1527(e), 416.927(e); *see also Frank v. Barnhart*, 326 F.3d 618, 620 (5th Cir. 2003).

Despite the weight given to the treating source's opinion, the ALJ must evaluate every medical opinion received.[11]  20 C.F.R. §§ 404.1527(d); 416.927(d).  Pursuant to 20 C.F.R. §

---

[11] According to the regulations, there are three types of medical source opinions: nonexamining, nontreating, and treating.  20 C.F.R. §§ 404.1502, 416.902.  Nonexamining sources are those whose assessments are premised solely on a review of medical records.  *Id.*  State agency medical and psychological consultants fall into this category.  *Id.*  Nontreating sources are those who have examined the claimant, but do not have an "on-going treatment relationship" with the claimant.  *Id.*  This "term includes an acceptable medical source who is a consultative examiner when the consultative examiner is not [a claimant's] treating source.  *Id.*  Treating sources are those medical sources who have had an "ongoing treatment relationship" with the claimant.  *Id.*

18

404.1527(d), unless a treating source's opinion is given controlling weight, the following factors are considered in deciding the weight to give to any medical opinion: (1) examining relationship, (2) treatment relationship, including the length, nature and extent of the treatment relationship, as well as the frequency of the examination(s), (3) supportability, (4) consistency, (5) specialization, and (6) other factors which "tend to support or contradict the opinion." 20 C.F.R. § 404.1527(d) (2009); *see also* SSR 96-6p; 20 C.F.R. § 416.927(d) (2009). "Neither the regulations nor the case law requires the ALJ to specifically enumerate and discuss each factor; the requirement is merely for the ALJ to consider the six factors." *Estrada v. Barnhart*, No. A-05-CA-960-AA, 2006 WL 1347970, at *9 (W.D. Tex. May 12, 2006) (*citing Witz v. Comm'r of Soc. Sec. Admin.*, 412 F. Supp. 2d 601, 608 (E.D. Tex. 2005)).

In this case, the ALJ, in making his decision at Step Three, concurred with the opinions of the State agency medical consultants that none of Bewley's severe impairments met or equaled any listed impairment in the Listing. (Tr. 28.) Contrary to Bewley's arguments, the ALJ did consider the opinion of Reddy that Bewley could not pursue gainful employment or handle stress due to her mental illness and specifically acknowledged Reddy's position as a treating psychiatrist. (Tr. 31, 36.) The ALJ, however, rejected Reddy's opinion and afforded it very little weight, finding that it was not credible in light of the following evidence in the record: (1) treatment records from MHMR and other medical evidence in the record, (2) fact that claimant was able to care for two children in the home; (3) records from Bewley's hospitalization in December 2006 showing that she had a very good mental status examination and Bewley's own reports at that time that she had not experienced depressive or manic episodes with medications for a number of years, and (4) the December 2006 assessment by a psychiatrist who was not

19

affiliated with MHMR rating Bewley's GAF at 55.  (Tr. 36.)  The ALJ, relying on Bewley's ability to perform a wide range of daily living activities, accepting much of  Bewley's testimony and statements as to her symptoms and thoughts, and noting that Bewley had never had an episode of decompensation, concluded that there was no evidence that Bewley met the "C" criteria of any applicable listing.  (Tr. 37.)

A review of the ALJ's written decision demonstrates that the ALJ complied with the regulations in considering the weight to be afforded to Reddy's opinion, and his decision to afford little weight to this opinion is supported by substantial evidence.  Reddy's conclusory statement to the effect that Bewley was unable to work is a legal conclusion, not a medical opinion, and is not entitled to any special significance.  *See* 20 C.F.R. §§ 404.1527(e)(1), 416.927(e)(1); *see also Frank*, 326 F.3d at 620.  The ALJ recognized and complied with his duty to weigh the medical opinions of record, even if a more thorough and organized discussion would have been preferable, and he articulated good cause for not assigning controlling weight to the Reddy's opinion.  Bewley has not demonstrated that the ALJ erred in his determination at Step Three that she had no impairment or combination of impairments meeting or equaling Section 12.04 of the Listing, nor has she shown that the ALJ's determination at Step Three of the sequential evaluation process is unsupported by substantial evidence.

2.  Waxing and Waning of Condition

The next issue is whether the ALJ erred by failing to make a finding that Bewley could not only obtain, but also maintain employment over a sustained period of time.  (Pl.'s Br. at 13.) Bewley argues that there is evidence in the record that Bewley's condition "waxed and waned" over time as her medications were continually adjusted as Bewley's condition changed from

20

feeling good to experiencing severe problems.  (*Id*.)  Bewley claims that due to the waxing and waning of her condition the ALJ erred by failing to make a finding that she can consistently deal with work stresses over a sustained period of time.  (*Id*.)  In support of her argument, Bewley relies on the United States Court of Appeals for the Fifth Circuit's holding in *Watson v. Barnhart*, 288 F.3d 212 (5th Cir. 2002) and *Frank*, 326 F.3d at 621.  (Pl.'s Br. at 13; Pl.'s Reply Br. at 4-5.)  *See also Singletary v. Bowen*, 798 F.2d 818 (5th Cir. 1986).

In this case, contrary to Bewley's claims, the ALJ did make a determination that Bewley could maintain employment over a sustained period of time.  To begin with, the ALJ, in his discussion at Step Three, specifically stated that he did not "construe any of the assessed limitations as to mental capacity in the prior determinations as establishing the claimant is incapable of working on a consistent, sustained basis."  (Tr. 28.)  In addition, in his RFC determination, the ALJ, specifically citing to *Watson* and *Singletary*, *supra*, stated that Bewley was able to obtain, perform, and *maintain* her RFC.  (Tr. 37.)  Because Bewley has not demonstrated that the assessment of her RFC is unsupported by substantial evidence or that the ALJ misapplied or failed to apply the appropriate legal standards in assessing her RFC, remand is not required.

<u>RECOMMENDATION</u>

It is recommended that the Commissioner's decision be affirmed.

<u>NOTICE OF RIGHT TO OBJECT TO PROPOSED</u>
<u>FINDINGS, CONCLUSIONS AND RECOMMENDATION</u>
<u>AND CONSEQUENCES OF FAILURE TO OBJECT</u>

Under 28 U.S.C. § 636(b)(1), each party to this action has the right to serve and file specific written objections in the United States District Court to the United States Magistrate Judge's proposed findings, conclusions and recommendation within ten (10) days after the party has been served with a copy of this document.  The court is hereby extending the deadline within which to file specific written objections to the United States Magistrate Judge's proposed findings, conclusions and recommendation until April 20, 2010.  The United States District Judge need only make a *de novo* determination of those portions of the United States Magistrate Judge's proposed findings, conclusions and recommendation to which specific objection is timely made.  *See* 28 U.S.C. § 636(b)(1).  Failure to file by the date stated above a specific written objection to a proposed factual finding or legal conclusion will bar a party, except upon grounds of plain error or manifest injustice, from attacking on appeal any such proposed factual findings and legal conclusions accepted by the United States District Judge. *See Douglass v. United Services Auto Ass'n*, 79 F.3d 1415, 1428-29 (5th Cir. 1996)(en banc).

<u>ORDER</u>

Under 28 U.S.C. § 636, it is hereby ORDERED that each party is granted until April 20, 2010 to serve and file written objections to the United States Magistrate Judge's proposed findings, conclusions and recommendation.  It is further ORDERED that if objections are filed and the opposing party chooses to file a response, the response shall be filed within seven (7) days of the filing date of the objections.

It is further ORDERED that the above-styled and numbered action, previously referred to

the United States Magistrate Judge for findings, conclusions and recommendation, be and hereby

is returned to the docket of the United States District Judge.

SIGNED MARCH 30, 2010.


        /s/  Charles Bleil                                    
CHARLES BLEIL
UNITED STATES MAGISTRATE JUDGE